IN THE DISTRICT COURT OF POTTAWATOMIE COUNTY **FILED**
STATE OF OKLAHOMA    IN THE DISTRICT COURT

JUN 2 0 2012

POTTAWATOMIE COUNTY, OK
RETA HEAD, COURT CLERK
BY _____ DEPUTY

PENNY EZELL, on behalf of            )
herself and all others similarly situated,   )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )   Case No. CS-2012-252
                                     )
GRACO CHILDREN'S PRODUCTS, INC.      )
and NEWELL RUBBERMAID, INC.,         )
                                     )
        Defendants.                  )

## CLASS ACTION COMPLAINT

### Parties

1.      Defendant Graco Children's Products, Inc. ("Graco") was, at all relevant times,

a foreign corporation organized and existing according to the laws of Delaware with its

principal place of business in Pennsylvania. Graco is and has been engaged in the business

of designing, manufacturing, distributing, marketing, and selling products in the state of

Oklahoma, including the "TurboBooster" child safety seat. Graco regularly did business in

Oklahoma, and its products, including the child safety seats involved in this case (the

"TurboBooster"), are regularly sold and used by consumers in Oklahoma.  Graco has,

therefore, submitted itself to the jurisdiction of this Court.

2.      Plaintiff, Penny Ezell, is a resident of Pottawatomie County, Oklahoma.

Plaintiff purchased a TurboBooster, model 8496DAZ, serial number JJ0524061016761,

with a manufacturing identification date of 052406.  Plaintiff purchased her Graco

TurboBooster child safety seat from Wal-Mart in Shawnee, Oklahoma.

3.      Graco is a "brand" of defendant Newell Rubbermaid, Inc. ("Newell

Rubbermaid"). At various times relevant to the matters alleged in this Complaint, Graco was



EXHIBIT

1

also known as a "division," "brand" and "subsidiary" of Newell Rubbermaid.   Newell Rubbermaid was, at all relevant times, a corporation organized and existing according to the laws of the state of Delaware. At all relevant times, Newell Rubbermaid has conducted business in the state of Oklahoma.   Newell Rubbermaid is and has been engaged in the business of designing, manufacturing, distributing, marketing, and selling products in the state of Oklahoma, including the TurboBooster child safety seat.   Newell Rubbermaid is subject to the jurisdiction of this Court.

4.      At all relevant times, Newell Rubbermaid supplied the capital and approvals necessary to design, manufacture, market, and sell the TurboBooster.  At all times, Newell Rubbermaid exercised complete dominion and control over Graco with respect to the TurboBooster, whether Graco is deemed a "brand," "subsidiary," or "division."

5.      Newell Rubbermaid employed in-house legal, compliance, and regulatory personnel to make decisions regarding the TurboBooster, and these employees, on behalf of Newell Rubbermaid, ultimately made or ratified the decisions that allowed the TurboBooster to be sold in a defective condition as more fully set forth below.

6.      Newell Rubbermaid is also responsible for all representations and warranties made by Graco.

7.      Newell Rubbermaid and Graco will be referred to collectively in this Complaint as "Defendants."

### Jurisdiction and Venue

8.      This Court has jurisdiction over this class action pursuant to 12 O.S. § 2023.

9.      Venue in this case is founded on 12 O.S. § 137. The causes of action of the named class representative arose in Pottawatomie County by sale and distribution of Graco TurboBooster child safety seats in Pottawatomie County.  Defendants are doing business in

2

Pottawatomie County, Oklahoma, and received compensation and profits from the sale of these child safety seats in Pottawatomie County, Oklahoma, and have made material omissions and misrepresentations in Oklahoma, including Pottawatomie County.

10.   The federal courts lack jurisdiction under 28 U.S.C. § 1332, which provides for federal jurisdiction in class actions with minimal diversity when damages exceed five million dollars, exclusive of interest and costs.  Defendants did not sell TurboBooster child safety seats to Oklahoma residents in sufficient quantities to trigger the jurisdictional minimum.

11.   The federal courts also lack subject matter jurisdiction over this action since there is no federal question jurisdiction.  Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave or of any officer of the United States or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiff sues no foreign state or agency.

<u>Factual Background</u>

12.   The TurboBooster is a belt-positioning child restraint device subject to 49 C.F.R. § 571.213, also known as Federal Motor Vehicle Safety Standard 213 ("FMVSS 213").

13.   FMVSS 213 is "a minimum standard for . . . motor vehicle equipment performance."  49 U.S.C. § 30102.

14.   At all relevant times, FMVSS 213 required that Defendants "self-certify" the TurboBooster as being in compliance with the standard before they sold or introduced any TurboBooster into the stream of commerce.

15.   Every TurboBooster ever sold by Defendants expressly warrants and represents on the safety seat itself and in a permanent label, the following:  "This child

restraint system conforms to all applicable Federal Motor Vehicle Safety Standards."

16.     Every TurboBooster ever sold by Defendants expressly warrants and represents, on the box that it is sold in, that the TurboBooster meets or exceeds the requirements of FMVSS 213.

17.     At all relevant times, FMVSS 213 required that the TurboBooster comply with the following:

S5.1.1. *Child restraint system integrity.* When tested in accordance with S6.1, each child restraint system shall meet the requirements of paragraphs (a) through (c) of this section.

(a) Exhibit no complete separation of any load bearing structural element . . . .

(b) (1) If adjustable to different positions, remain in the same adjustment position during the testing that it was in immediately before the testing . . . .

18.     The TurboBooster is a "belt-positioning booster."  It is not equipped with integrated harnesses or buckles but, instead, "positions" a child (raises the child off the automobile seat) so that the child can utilize the lap/shoulder seat belts in the vehicle.

19.     The TurboBooster is designed to be used in vehicle seating positions that are equipped with a lap/shoulder safety belt.  When a child is using the TurboBooster, the lap belt is routed across the child's lap and rests on two lap belt guides on the TurboBooster. The shoulder belt is routed down and across the child's chest and under the TurboBooster armrest that is adjacent to the seat belt buckle (where it joins the lap belt and is then buckled).

20.     Every TurboBooster ever sold by Defendants has adjustable armrests.  The armrests have two intended positions: "up" and "down."

21.     In an FMVSS 213 sled test (a frontal collision), crash loads are initially transmitted into the shoulder belt by the child dummy.  Once the slack in the belt is

absorbed, the shoulder belt loads the armrest that is closest to the seat belt buckle.

22.    The armrests are structural load-bearing elements of the TurboBooster.

23.    Defendants have known or should have known, no later than 2002 (the first year of production), that the armrests of the TurboBooster were load-bearing structural elements of the seat.

24.    Prior to the commencement of production of the TurboBooster, Defendants knew, or certainly could and should have known, that the National Highway Transportation Safety Administration ("NHTSA") and its test contractors had determined that the armrests on belt-positioning boosters were "load-bearing structural elements."

25.    Because the armrests on the TurboBooster are adjustable, they are not permitted to change position during a sled test. A design that allows the armrest to change position during a sled test as alleged above is a violation of FMVSS 213, S5.1.1(b).

26.    Any TurboBooster that contains a design that allows the armrest to change position during a sled test does not "conform" with FMVSS 213.

27.    TurboBoosters are designed in a manner that allows the armrest on the TurboBooster to separate completely from the base.   A design that allows the armrest to separate from the base during a sled test is a violation of FMVSS 213, S5.1.1(a).

28.    Any TurboBooster that contains a design that allows the armrest to completely separate from the base during a sled test does not "conform" with FMVSS 213.

29.    From the commencement of production in June 2002 through late 2007 or early 2008, Defendants sold millions of TurboBooster safety seats to consumers in the United States. All of these TurboBoosters shared common design defects that allowed the armrests to change position and/or completely separate from the seat's base. The principal design defect that allowed the armrests of the TurboBooster to change position and

separate under crash forces is a plastic screw "boss" that was too thin, short, and weak for the retention screw to "bite" into.

30.     Defendants' implementation of a design and manufacturing change to the TurboBooster in approximately 2007 or 2008 resolved the lack of compliance with the child restraint system integrity requirements contained in FMVSS 213 and eliminated the safety related defect in the seats.

31.     Defendants knew or should have known at all times that, prior to the design and manufacturing change of the plastic screw "boss," that the TurboBooster was not compliant in multiple respects with FMVSS 213 and that it contained a safety related defect.

32.     Defendants knew at all times that the pre-2008 design of the TurboBooster presented a safety hazard to the users of the TurboBooster safety seats and that the sale of the TurboBooster to Plaintiff and the public constituted the sale of a damaged product that could not perform as warranted.

33.     At all relevant times, 49 U.S.C. § 30018(c)(1) required that Defendants notify owners of the TurboBoosters once it knew, or should have known, in good faith, that the safety seat contained a defect that related to motor vehicle safety.  A change of position of the adjustable armrest during a sled test, or a complete separation of the armrest during a sled test, is a safety related defect.

34.     Despite their knowledge as alleged herein, Defendants knowingly and deliberately concealed all information relating to the armrest failures from consumers and continue to conceal this information to this day.  Defendants concealed this information so that they could continue producing and selling the TurboBooster without losing market share to their competitors (none of whom utilized adjustable armrests in their belt-positioning boosters) and so they could avoid the financial costs and loss of brand reputation that would

be associated with a recall or other public notification. More specifically, Defendants concealed, among other things, the following:

    a.   That after its first round of sled tests, Graco managers knew that the armrest issue was a "problem" that required a "design fix."

    b.   That because of the armrest "problem," it began production of the TurboBooster in June 2002 "at risk."

    c.   That after going into production "at risk," the armrests continued to fail in sled testing, including failures in tests denominated by Graco as "compliance" tests.

    d.   That fixing the armrest "problem" was assigned the lowest priority at Graco.

    e.   That by 2005, after numerous sled test failures, Graco engineers finally changed the design of the screw boss (making it wider and longer, but not thicker), so that the "load bearing capability" of the armrest would be improved and so that the "distribution of the load is better."

    f.   In October 2005, a lawsuit was filed against Graco in federal court in South Carolina after a child was ejected from a TurboBooster and killed when his armrest detached. In the case, Graco's Rule 30(b)(6) witness, a senior compliance engineer, testified that Graco had experienced only two (2) armrest failures in sled testing. The testimony was false. The number of complete armrest separations as of the date of this deposition (2/23/07) was actually fourteen (14). The number of times the armrest changed position but did not completely separate was at least five (5). The NHTSA would later send Graco a request for information about the

TurboBooster and the death of the child; all of these sled test failures were affirmatively concealed by Graco.

g. On July 24, 2006, after another armrest separation in a sled test, Graco's senior compliance engineer documented that the failures "could be a technical non-compliance" with FMVSS 213 and that production should not go forward "until this is resolved." This same engineer would later document that he "didn't want to argue the point" with NHTSA; as a result, information regarding the "technical non-compliance" was not, and has never been, disclosed to NHTSA.

h. In April 2007, Graco decided to thicken the screw boss in accordance with the recommendations made by its compliance engineer eight months earlier.

i. In May 2007, the armrest separation problem on the seats was categorized internally at Graco as a "compliance" issue.

j. In August 2007, the first seats with the "fix" began to be sold. However, on information and belief, Graco did not stop production to implement the fix on all of its armrest molds at once; rather, the molds were taken out of production so that the "fix" could be made only when demand slacked off enough to allow a slight decrease in production.

35.    Every TurboBooster sold prior to the implementation of the August 2007 design change was sold with the representation that the seats "conform to," "meet" or "exceed" all applicable FMVSS 213 requirements.

36.    Defendants knew or should have known, however, that these seats did not comply.  Specifically, and among other things, Defendants deliberately, actively and

8

successfully concealed everything they knew about the TurboBooster armrest failures from the public.

37.     Defendants entered into a protective order in *McCune, et al. v. Graco Children's Products, Inc.*, et al., Civil Action No. 509-CV-107, pending in the U.S. District Court for the Eastern District of Texas, which prevents the disclosure of TurboBooster discovery to this Court. In the event Defendants challenge the sufficiency of the Complaint pursuant to the Oklahoma Rules of Civil Procedure, Plaintiff requests that this Court first modify the *McCune* protective order so that Plaintiff may amend this pleading to include information obtained in *McCune*.

<u>Class Action Allegations</u>

38.     Under 12 O.S. § 2023, Plaintiff brings this action on behalf of herself and the plaintiff class, initially defined as:

> All Oklahoma residents who purchased a Graco TurboBooster manufactured prior to the implementation of the current TurboBooster design.

39.     Excluded from the plaintiff class are:

A.      Defendants and any entity in which Defendants have a controlling interest, and its legal representatives, employees, officers, directors, assigns and successors;

B.      Persons who allege a physical injury arising from the defect;

C.      The judge, magistrate and any special master to whom this case is assigned, and any member of their immediate families; and

D.      To the extent the class certification order permits exclusion, all persons who timely submit proper requests for exclusion from the plaintiff class.

40. The plaintiff class consists of all Oklahoma residents who purchased a Graco TurboBooster manufactured prior to the implementation of the current design, thus making individual joinder impracticable pursuant to 12 O.S. § 2023(A)(1). The disposition of the claims in a single class action will provide substantial benefits to all parties and to the Court.

41. The factual and legal bases of the claims are common to all plaintiff class members and represent a common injury, 12 O.S. § 2023(A)(2).

42. There are many common questions of law and fact. These common issues include, but are not limited to, the following:

A. Whether Defendants conceived, designed, and manufactured a TurboBooster that did not meet the structural integrity requirements of FMVSS 213;

B. Whether Defendants conceived, designed, and manufactured a TurboBooster that contained a safety related defect;

C. Whether Defendants implemented a uniform fix for the defect;

D. Whether Defendants breached express warranties;

E. Whether Defendants breached implied warranties; and

F. Whether Defendants' conduct constituted fraudulent concealment.

43. The named Plaintiff identified in this Complaint purchased the Graco TurboBooster prior to the availability of the modified TurboBooster with a design fix and is thus typical of the class, 12 O.S. § 2023(A)(3).

44. Plaintiff will fairly and adequately represent and protect the interests of the plaintiff class, as required by 12 O.S. § 2023(A)(4). Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the plaintiff class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interests adverse to those of the class.

## Breach of Express Warranty

45.    Plaintiff repeats and realleges each and every allegation of this Complaint as if fully set forth herein verbatim.

46.    At all times, Defendants are and have been engaged in the business of designing, manufacturing, distributing, marketing, and selling the TurboBooster child safety seat throughout the United States, including the state of Oklahoma.

47.    At all times, Defendants are and have been merchants and sellers of the TurboBooster child safety seat, and Defendants sold the TurboBooster child safety seat to the consumer Plaintiff and the members of the class.

48.    Every TurboBooster seat ever sold by Defendants, including all TurboBooster seats sold to Plaintiff and the members of the class, expressly affirms, promises, warrants and represents on the safety seat itself and on a permanent label, the following: "This child restraint system conforms to all applicable Federal Motor Vehicle Safety Standards."

49.    Every TurboBooster seat ever sold by the Defendants, including all TurboBooster seats sold to Plaintiff and the members of the class, expressly affirms, promises, warrants and represents on the box in which it is sold, that the TurboBooster seats "conform to," "meet," or "exceed" all applicable FMVSS 213 requirements.

50.    Defendants expressly warranted to Plaintiff and the members of the class that all of the TurboBooster child safety seats were merchantable and fit for their ordinary, particular and intended use and purpose as a child safety restraint.

51.    However, the TurboBooster seats sold by Defendants to Plaintiff and the members of the class do not conform to all applicable Federal Motor Vehicle Safety Standards.

52.    The TurboBooster child safety seats sold by the Defendants to Plaintiff and the members of the class fail to conform to FMVSS 213 because, as alleged more fully herein, the seats all share common design defects that allow the armrests to change position and/or completely separate from the seat's base. This design defect was not remedied until Defendants implemented a design change in approximately late 2007 or 2008.

53.    The TurboBooster seats sold by Defendants to Plaintiff and the members of the class are not merchantable and fit for their ordinary, particular and intended use and purpose as a child safety restraint. These seats contain a safety related defect.

54.    Defendants breached their express warranties to Plaintiff and the members of the class that the TurboBooster seats were merchantable at the time of delivery, thus depriving Plaintiff and the members of the class of the product they bargained for - - a seat that conformed as warranted to FMVSS 213.

55.    Defendants breached their express warranties to Plaintiff and members of the class that the TurboBooster seats were fit for their ordinary, particular and intended use and purpose as a child safety restraint at the time of delivery.

56.    Defendants breached their express warranties to Plaintiff and the members of the class that the TurboBooster seats conformed to all Federal Motor Vehicle Safety Standards at the time of delivery.

57.    Defendants have breached their express warranties to Plaintiff and the members of the class that the TurboBooster seats conformed to, met or exceeded all applicable FMVSS 213 requirements.

58.    Defendants have received notice of the breach.

59.     Defendants have also received notice by virtue of the defect and Defendants' knowledge of the defect as alleged herein.  Indeed, as mentioned above, the TurboBoosters at issue failed Defendants' own internal compliance tests.

60.     Further, it would have been futile for Plaintiff to notify the *retailer* of the TurboBooster when she became aware of the defect concealed by Defendants because the Defendants instructed Plaintiff to notify Defendants directly. *See* Exhibit A.  Additionally, Defendants also represented to Plaintiff that Defendants would only repair or replace her TurboBooster if she discovered the defect within one year of purchase. *Id.*

61.     The element of privity, if found to be applicable, exists vis-à-vis Defendants and the members of the class because: (i) Defendants have had direct written communications with Plaintiff and the members of the class with regard to the TurboBoosters via standardized warranty forms; (ii) the retailers that have sold TurboBoosters to Plaintiff and the members of the class are agents, in law or in fact, of Defendants; (iii) Defendants have entered into contracts with Plaintiff and the members of the class in connection with the assurance of the warranties at issue; and (iv) Plaintiff and members of the class are the intended third-party beneficiaries of the warranties at issue.

62.     As a direct and proximate result of Defendants' breaches, Plaintiff and the members of the class have suffered monetary loss.

63.     Plaintiff and the members of the class paid full market value for a child safety seat, reasonably believing that it conformed to the FMVSS.  Instead, Plaintiff and the members of the class received a child safety seat that failed to conform to the FMVSS as alleged herein.

64.     Plaintiff and the members of the class have been deprived of the product they bargained for – a child safety seat that conformed to the FMVSS.

13

65.     The TurboBoosters purchased by Plaintiff and the members of the class were rendered completely useless due to their failure to conform to minimum federal safety standards as alleged herein.

66.     Plaintiff and the members of the class are entitled to recover the difference between what they were entitled to receive – a child safety seat that conformed to the FMVSS – with what they received – a child safety seat that did not conform to the FMVSS.

67.     Specifically, Plaintiff and the members of the class are entitled to a refund of the full purchase price of the TurboBoosters.

### Breach of Implied Warranty

68.     Plaintiff repeats and realleges each and every allegation as though fully set forth herein verbatim.

69.     At all times, Defendants impliedly warranted to Plaintiff and the members of the class that the Graco TurboBooster was fit for its intended use and purpose as a child safety seat.

70.     At all times, Plaintiff and the members of the class relied on representations made by Defendants that the Graco TurboBooster was appropriate for safety.

71.     Defendants breached their implied warranty to Plaintiff and the members of the class in that Graco TurboBooster child safety seats are unfit for their intended use and purpose and fail to conform to all applicable Federal Motor Vehicle Safety Standards, as promised on the labeling of each and every TurboBooster sold to Plaintiff and the members of the class.

72.     Defendants have received notice of the breach.

73.    Defendants have also received notice by virtue of the defect and Defendants' knowledge of the defect as alleged herein.  Indeed, as mentioned above, the TurboBoosters at issue failed Defendants' own internal compliance tests.

74.    Further, it would have been futile for Plaintiff to notify the *retailer* of the TurboBooster when she became aware of the defect concealed by Defendants because the Defendants instructed Plaintiff to notify Defendants directly. *See* Exhibit A.  Additionally, Defendants also represented to Plaintiff that Defendants would only repair or replace her TurboBooster if she discovered the defect within one year of purchase. *Id.*

75.    As a direct and proximate result of Defendants' breaches, Plaintiff and the members of the class have suffered monetary loss.

76.    Plaintiff and the members of the class paid full market value for a child safety seat, reasonably believing that it conformed with the FMVSS.  Instead, Plaintiff and the members of the class received a child safety seat that failed to conform to the FMVSS as alleged herein.

77.    Plaintiff and the members of the class have been deprived of the product they bargained for – a child safety seat that conformed to the FMVSS.

78.    The TurboBoosters purchased by Plaintiff and the members of the class were rendered completely useless due to their failure to conform to minimum federal safety standards as alleged herein.

79.    Plaintiff and the members of the class are entitled to recover the difference between what they were entitled to receive – a child safety seat that conformed to the FMVSS – with what they received – a child safety seat that did not conform to the FMVSS.

80.    Specifically, Plaintiff and the members of the class are entitled to a refund of the full purchase price of the TurboBoosters.

Fraudulent Concealment

81.    Plaintiff repeats and realleges each and every allegation of this Complaint as if fully set forth herein verbatim.

82.    At all times, Defendants possessed superior knowledge of the TurboBooster child safety seat and its failures and defects.

83.    At all times, Plaintiff and the members of the class, without any fault or lack of diligence on their own part, were unaware and ignorant of the true character, nature and quality of the TurboBooster child safety seat. Plaintiff and the members of the class were also unaware and ignorant of, without any fault or lack of diligence on their own part, of the defects and failures of the TurboBooster child safety seat.

84.    Defendants had a duty, and have a continuing duty, to disclose material facts relating to the TurboBooster child safety seats to Plaintiff and the members of the class, and Defendants failed to do so.

85.    As previously mentioned herein, the armrests of the TurboBooster seat are structural load-bearing elements of the TurboBooster.

86.    Defendants should have known, since before the TurboBooster was first produced in 2002, that the armrests of the TurboBooster were load-bearing structural elements of the seat.

87.    From commencement of production in June 2002 through late 2007 or early 2008, Defendants sold millions of TurboBooster safety seats to consumers in the United States, including Plaintiff and the members of the class. All of the TurboBoosters sold to Plaintiff and the members of the class shared design defects that allowed the armrests to change position and/or completely separate from the seat's base.

88.    Defendants knew that the TurboBooster seats were defective.

89.    Defendants knew at all times that the armrest failures in the TurboBooster child safety seats were not in compliance, in multiple respects, with Federal Motor Vehicle Safety Standards, and that the seats contained a safety related defect.

90.    Defendants knew at all times that the armrest failures in the TurboBooster presented a safety hazard to the users of the TurboBooster safety seats.

91.    Every TurboBooster sold prior to the implementation of the design change, as alleged herein, was sold with the express affirmation, promise, warranty and representation that the TurboBooster child safety seats "conform to," "meet," or "exceed" all applicable FMVSS 213 requirements.

92.    However, Defendants knew that the TurboBooster seats did not comply and that the seats contained a safety related defect.  Defendants engaged in a pattern of fraud, deception, and concealment intended to keep the TurboBooster's lack of compliance with FMVSS 213 and the existence of the safety related defect a secret.  Plaintiff will provide additional specifics of such fraud, deception and concealment following modification of the *McCune* protective order.

93.    Defendants have deliberately, actively, and successfully concealed everything they know about the TurboBooster armrest defects and failures from the public.

94.    Because of Defendants' fraudulent concealment of the material facts, as alleged herein, Defendants are estopped from relying on any statute of limitations defense because of their concealment of the true character, quality, and nature of the TurboBooster child safety seat.

95.    The applicable statutes of limitation to the causes of action alleged herein are, therefore, tolled by virtue of Defendants' knowing, willful, and active concealment of all facts alleged herein.

96.     Plaintiff and the members of the class were ignorant of this information, which was and is essential to the pursuit of the claims alleged herein, without any fault or lack of diligence on their own part.

97.     Plaintiff justifiably and reasonably relied on the misinformation provided to her in the express warranties.  Specifically, Plaintiff justifiably relied on Defendants' express affirmation, promise, warranty, and representation that the TurboBooster child safety seats "conform to," "meet," or "exceed" all applicable FMVSS 213 requirements and federal safety standards.

98.     Plaintiff justifiably and reasonably relied on this information to her detriment.

99.     If not for the representations made by the Defendants that the child safety seats met minimum federal safety standards, Plaintiff would not have purchased the TurboBooster child safety seat.  Indeed, without Defendants' false and misleading self-certification that the TurboBooster met all minimum safety standards and thus did not contain a safety related defect, Plaintiff and the members of the class could not have purchased a TurboBooster because it would not have been allowed for sale in the United States.

100.    Defendants' fraudulent concealment is common to Plaintiff and the members of the class.

101.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff and the members of the class have suffered monetary loss.

102.    Plaintiff and the members of the class paid full market value for a child safety seat, reasonably believing that it conformed with the FMVSS.  Instead, Plaintiff and the members of the class received a child safety seat that failed to conform to the FMVSS as alleged herein.

103. Plaintiff and the members of the class have been deprived of the product they bargained for – a child safety seat that conformed to the FMVSS.

104. The TurboBoosters purchased by Plaintiff and the members of the class were rendered completely useless due to their failure to conform to minimum federal safety standards as alleged herein.

105. Plaintiff and the members of the class are entitled to recover the difference between what they were entitled to receive – a child safety seat that conformed to the FMVSS – with what they received – a child safety seat that did not conform to the FMVSS.

106. Specifically, Plaintiff and the members of the class are entitled to a refund of the full purchase price of the TurboBoosters.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, pray that the Court enter judgment against Defendants and in favor of Plaintiff and the class and to award the following relief:

A.      Certification of the proposed class under 12 O.S. § 2023;

B.      Appointment of Plaintiff Ezell as class representative;

C.      Appointment of the undersigned attorneys as class counsel;

D.      Finding that the Defendants' conduct constitutes a breach of express warranty;

E.      Finding that the Defendants' conduct constitutes a breach of implied warranty;

F.      Finding that Defendants' conduct constitutes fraudulent concealment;

G.      An award of compensatory damages and attorneys' fees; and

H.      Such other and further judiciary determinations and relief as may be appropriate in this proceeding.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

June __, 2012                                    Respectfully submitted,

Terry W. West (OBA No. 9496)
E-mail:  terry@thewestlawfirm.com
Bradley C. West (OBA No. 13476)
E-mail:  brad@thewestlawfirm.com
THE WEST LAW FIRM
124 W. Highland
Shawnee, OK  74801
(405) 275-0049
(405) 275-0052 – Facsimile

A. Hoyt Rowell, III
(pending admission *pro hac vice*)
E-Mail: hrowell@rpwb.com
T. Christopher Tuck
(pending admission *pro hac vice*)
E-Mail: ctuck@rpwb.com
RICHARDSON PATRICK
WESTBROOK & BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC  29464
(843) 727-6500
(843) 216-6509 - Facsimile

DOUTHIT, FRETS, ROUSE, GENTILE &
RHODES, LLC
R. Douglas Gentile
(pending admission *pro hac vice*)
903 East 104th Street, Suite 610
Kansas City, MO  64131
E-Mail: dgentile@dfrglaw.com

ATTORNEYS FOR PLAINTIFF

20



Welcome  I   Sign In  | Create an Account |         my           my           shopping
                                                    account       favorites      cart

Search Site

Home  >  Help Center  >  Limited Warranty

# Limited Warranty

FAQs

Recall & Safety Notifications

Product Instructions

Product Care & Maintenance

Contact Us

Limited Warranty

At Graco®, we make innovative, high quality products for babies and children. We warrant this product to be free from defects in material and workmanship existing at the time of manufacture for a period of one year from the date of initial purchase (sales receipt is required for proof of purchase). If such a defect is discovered during the limited warranty period, we will, at our sole option, repair or replace your product at no cost to you.

This limited warranty does not cover claims resulting from misuse, failure to follow the instructions on installation, maintenance and use, abuse, alteration, involvement in an accident, and normal wear and tear.

THIS LIMITED WARRANTY IS EXCLUSIVE AND IN LIEU OF ANY OTHER WARRANTY, WRITTEN OR ORAL, INCLUDING BUT NOT LIMITED TO ANY EXPRESS WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THE DURATION OF ANY IMPLIED WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IS EXPRESSLY LIMITED TO THIS LIMITED WARRANTY PERIOD.

Some states do not allow limitations on how long an implied warranty lasts; therefore, the above limitations and exclusions may not apply to you.

THE CUSTOMER'S EXCLUSIVE REMEDY FOR BREACH OF THIS LIMITED WARRANTY OR OF ANY IMPLIED WARRANTY OR OF ANY OTHER OBLIGATION ARISING BY OPERATION OF LAW OR OTHERWISE SHALL BE LIMITED AS SPECIFIED HEREIN TO REPAIR OR REPLACEMENT, AT OUR SOLE OPTION. IN ANY EVENT, RESPONSIBILITY FOR SPECIAL, INCIDENTAL AND CONSEQUENTIAL DAMAGES IS EXPRESSLY EXCLUDED.

Some states do not allow an exclusion or limitation of special, incidental or consequential damages, therefore, that limitation or exclusion may not apply to you.

This limited warranty gives you specific legal rights, and you may have other rights that vary from state to state or province to province.

**For warranty service or replacement part information:**

**USA**: Please call 1-800-345-4109, or write to Consumer Services, Graco Children's Products, 150 Oaklands Boulevard, Exton, PA 19341.

**Canada**: Please e-mail us at: service@elfe.ca, call 1-800-667-8184, or write to Elfe Juvenile Products, 4500 Thimens Boulevard, Saint-Laurent, QC  H4R 2P2, Canada.

**Outside USA and Canada**: Please contact place of purchase for warranty service.

**Some replacement parts may be available for purchase after this limited warranty expires.** Please visit our parts ordering section or call 1-800-345-4109 for details. In Canada Call 1-800-667-8184 or e-mail: service@elfe.ca.

**Parts & Toys**



**Looking for replacement parts?**

Some replacement parts may be available for purchase after this limited warranty expires. ›



EXHIBIT

A

**Heart to Heart Blog**: Share in the wondrous joys of parenthood with the Graco family!

**Connect with us**          **Recall Information**          **Receive Graco News!**

√31/12                 Limited Warranty | Graco – the leading brand of car seats, strollers, playards, swings and high chairs

Fan us on facebook        2010 Quattro Tour™ and        Get the latest updates on new
                                          MetroLite™ Stroller Recall    products, promotions, and more.
Follow us on twitter        2010 Simplicity Crib Recall
                                          (Mattress Support)
Explore us on Flickr        2010 Drop Side Crib by LaJobi   Enter email address
                                          Recall
Watch us on YouTube

Privacy Policy • Legal Notices • Terms Of Service • Feedback • About Graco®

©2012 Graco Children's Products Inc. All rights reserved.

Everything we do here at Graco is inspired by you so please take a moment to help guide us by providing your suggestions for improvement or feedback.